Kristine M. Akland
Center for Biological Diversity
P.O. Box 7274
Missoula, MT 59807
Phone: (406) 544-9863
Email: kakland@biologicaldiversity.org

*Attorney for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; )<br><br>  Plaintiff, )<br><br>  v. )<br><br>U.S. FISH AND WILDLIFE SERVICE; MARTHA WILLIAMS, in her official capacity as Principal Deputy Director of the U.S. Fish and Wildlife Service; DEPARTMENT OF THE INTERIOR; DEB HAALAND, in her official capacity as Secretary of the Interior; )<br><br>  Defendants. ) | Case No._____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## **INTRODUCTION**

1.     The Center for Biological Diversity ("Center") brings this lawsuit to

challenge a rule heralded by the Trump Administration as the largest-ever

expansion of hunting and fishing on the National Wildlife Refuge System ("Refuge

System"). *See* 2020-2021 Station-Specific Hunting and Sport Fishing Regulations,

85 Fed. Reg. 54,076 (Aug. 31, 2020) ("Hunting and Fishing Rule"). Promulgated

1

by U.S. Fish and Wildlife Service ("Service"), the Hunting and Fishing Rule expands use of lead ammunition and tackle on numerous units of the Refuge System, including refuges where the agency never previously allowed hunting or fishing. This expansion harms many endangered species that live on or around these refuges, including the grizzly bear, jaguar, ocelot, jaguarundi, Audubon's crested caracara, wood stork, and whooping crane.

2.     The Refuge System is the only system of federal lands dedicated primarily to wildlife conservation. The Refuge System's public lands and waters are particularly important for endangered species.  More than 500 species protected by the Endangered Species Act ("ESA")—nearly one-third of all U.S. listed species—are found on wildlife refuges.

3.     The Hunting and Fishing Rule opened or expanded more than 2.3 million acres of refuge lands to sport hunting or fishing. This Complaint focuses on the harmful impacts to endangered wildlife living on Swan River National Wildlife Refuge ("NWR") in Montana, Leslie Canyon NWR in Arizona, Laguna Atascosa NWR in Texas, Everglades Headwaters and St. Marks NWRs in Florida, Kirwin NWR in Kansas, Patoka NWR in Indiana, and Lacreek NWR in South Dakota.

4.     This massive expansion of hunting and fishing across the Refuge System violates the law. Specifically, Defendants U.S. Fish and Wildlife Service ("Service"); and Martha Williams, Principal Deputy Director of the Service;

Department of Interior ("Interior"); Deb Haaland, Secretary of the Interior

("Secretary"), have violated the Endangered Species Act ("ESA"), 16 U.S.C. §

1536; the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4321 et

seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.

5.      The Service has violated the ESA by expanding sport hunting and

fishing on numerous refuges without properly analyzing through Section 7

consultations the adverse effects on ESA protected species. More specifically, the

Service failed to examine the risks that lead ammunition and tackle could poison

endangered species at almost every NWR at issue in this Complaint. The Service

also failed to consider impacts of hunting in areas used by endangered species,

including hunters misidentifying and unintentionally killing threatened grizzly

bears, or killing grizzly bears in self-defense, when targeting black bears at Swan

River NWR; increased traffic from hunters causing vehicle collisions with the

endangered ocelot and jaguarundi at Laguna Atascosa NWR; hunters

misidentifying and unintentionally killing whooping cranes when hunting sandhill

cranes at Lacreek NWR; and hunter-generated noise and other disturbance on the

threatened wood stork at Everglades Headwaters NWR and St. Marks NWR. The

Service has also violated NEPA by not properly analyzing or disclosing the direct,

indirect, and cumulative environmental impacts of expanded lead use on wildlife.

Defendants' arbitrary and capricious decision-making has also violated the APA.

6.      Through this Complaint, Plaintiff seeks a declaration that the Service's Hunting and Fishing Rule violates federal law and injunctive relief to redress the injuries these violations are causing. 28 U.S.C. §§ 2201-2202. Should Plaintiff prevail, it will also seek an award of costs, attorneys' fees, and other expenses pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 16 U.S.C. § 1540(g)(1A) (ESA citizen suit provision), and 5 U.S.C. § 702 (APA). This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706(2).

8.      Plaintiffs provided Defendants with at least 60 days' notice of the ESA violations alleged herein as required by 16 U.S.C. § 1540(g)(2)(A) in a letter dated October 22, 2020. Defendants have not remedied the violations set out in the notice and an actual controversy exits between the parties within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a substantial part of the violations of law by Defendants occurred and continue to occur in this district, and injury to Plaintiff and its members occurred and continue to occur in this district. 16 U.S.C. § 1540(g)(3)(A).

## PARTIES

10.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY is a non-profit 501(c)(3) organization with over 1.7 million members and supporters across the country. The Center has thousands of members living in the states with refuges at issue in this Complaint. The Center maintains staff and offices in Montana, Arizona, Florida, and elsewhere across the country. The Center works through science, law, and media to protect rare wildlife and their habitat, including species that utilize the national wildlife refuges at issue in this Complaint.

11.     Plaintiff's members live, recreate, or work near areas affected by the Service's Hunting and Fishing Rule. Plaintiff, organizationally and on behalf of its members, has deep and long-standing interests in the preservation and recovery of imperiled species and their habitat, including those found at the refuges at issue in this Complaint. Plaintiff's interests in protecting and recovering these species are directly harmed by the Service's implementation of its Hunting and Fishing Rule.

12.     Plaintiff's members include individuals with a broad range of interests in the wildlife that depend on these refuges. This includes scientific, professional, educational, recreational, aesthetic, and moral interests in the rare wildlife harmed by the Hunting and Fishing Rule. In addition, plaintiff's members use and enjoy the habitat of the species harmed by the Hunting and Fishing Rule.

13.     For example, one of the Center's members in Montana lives near

Swan River NWR and visits often. They are particularly interested in grizzly bears and look for them whenever they visit the refuge for hiking and wildlife watching. The Hunting and Fishing Rule harms their interests in grizzly bears because the risk to the bears from hunters reduces their ability to see the bears or their sign (like tracks and scat) during their future visits to the refuge.

14.     Two Center members live near Leslie Canyon NWR. They are both particularly interested in jaguars and they visit the refuge frequently to look for jaguars and other wildlife. They have trail cameras installed in areas where jaguars have been sighted and have captured images of numerous species of wildlife. They both engage in wildlife photography for pleasure, education, and professional interests. One of the members' photographs of a jaguar near Leslie Canyon NWR was published in an article about the jaguar. He wrote about the value of teaching his son about the jaguar's ecosystem in Arizona. The Hunting and Fishing Rule harms both members' interests in jaguars.  It reduces their ability to see the jaguar or capture it on video, thereby harming their professional, educational, and personal interests in the animal and its habitat.

15.     One Center member recently travelled across the country to Laguna Atascosa NWR specifically to try to observe ocelots in the wild. This was his second visit to the refuge for wildlife watching and he plans to return again. The Hunting and Fishing Rule harms his interests in ocelots and jaguarundi because the

risks of increased traffic from hunters causing vehicle collisions or lead poisoning will reduce his ability to see the rare animals in the wild during future visits to the refuge. Another Center member deeply cares about the conservation of ocelots and jaguarundi at Laguna Atascosa NWR. She lives within driving distance of the refuge, teaches science, and incorporates wildlife conservation in her classroom. The Hunting and Fishing Rule harms her professional and educational interests. It diminishes her ability to have her students view these endangered animals on an upcoming school trip to Laguna Atascosa NWR. It also harms her spiritual, personal, and aesthetic interests because she has dedicated her life to conservation and the protection of endangered species.

16.     One of the Center's members in Florida visits the Everglades NWR and St. Marks NWR often for wildlife photography. She has photographed the Audubon's crested caracara and the wood stork and continues to look for them to capture in her photography that she sells and keeps for pleasure. She intends to return often to both refuges. The Hunting and Fishing Rule harms her professional interests in photographing these birds because hunter-generated noise and disturbance reduces her ability to see them. Use of lead also risks poisoning the birds and reduces her opportunities to view them in the wild. This harms her recreational and aesthetic interests because she enjoys being at Everglades NWR and St. Marks and searching for these animals.

17.     One of the Center's members in Kansas recently visited Kirwin NWR specifically for birdwatching. She intends to return for birding in 2022. She cares about the conservation of whooping cranes and is specifically concerned with the harmful impacts lead shot and lead tackle will have on whooping cranes at Kirwin NWR. The Hunting and Fishing Rule harms her interests in whooping cranes because the risk to the whooping cranes from lead used in sport fishing reduces her ability to see whooping cranes when she visits.

18.     One of the Center's members in Indiana lives near Patoka NWR and specifically intends to visit at the end of 2021 and in future years to look for whooping cranes. He is professionally invested in the conservation of this species and is specifically concerned with the impacts lead shot will have on whooping cranes at Patoka NWR. The Hunting and Fishing Rule harms his professional interests in protecting the species and harms his recreational and aesthetic interests in seeing this bird in the wild because the risk to whooping cranes from both sport hunting and fishing at Patoka NWR reduces his ability to see whooping cranes when he visits.

19.     One of the Center's members in South Dakota has been visiting Lacreek NWR about once a year for many years. She is involved in various local bird conservation organizations and is specifically interested in the protection of whooping cranes. She intends to visit Lacreek NWR in 2022 to look for whooping

cranes. She is concerned with the impacts lead shot may have on whooping cranes at Lacreek NWR. The Hunting and Fishing Rule harms her recreational, aesthetic, and moral interests in protecting the species because the risk to whooping cranes from sport hunting reduces her ability to see and enjoy whooping cranes when she visits.

20.     Plaintiff's members have visited and plan to continue to travel to and recreate in the refuges at issue in this Complaint, and they will maintain these interests in the future.

21.     Plaintiff's members' interests have been and will continue to be greatly diminished by the Service's implementation of the Hunting and Fishing Rule because it thwarts and decreases Plaintiff's members' opportunities to observe the wildlife that use the refuges impacted by the Hunting and Fishing Rule. It also diminishes their interest in recreating in these refuges. For example, Center members who enjoy bird watching or photography may be forced to avoid refuges during hunting seasons or find that their visits are disturbed by the traffic and noise created by hunters.

22.     Plaintiffs also have an interest in the effective implementation of environmental laws aimed at protecting wildlife and wildlife habitat, including the ESA and NEPA. They are injured by Defendants' failure to comply with the ESA's mandate to use the best available science when consulting under Section 7.

In particular, they are injured by the agency's failure to consider the adverse effects of lead and other negative impacts of expanded hunting on the listed species at issue in this Complaint. They are also injured by Defendants' failure to analyze the direct, indirect, and cumulative impacts of lead use at the refuges at issue in this Complaint, as NEPA requires.

23.    Defendants' implementation of the Hunting and Fishing Rule without complying with mandatory duties under the ESA and NEPA have harmed and continue to harm Plaintiff's interests. The injuries described are actual, concrete injuries presently suffered by Plaintiff and Plaintiff's members and they will continue to occur unless this Court grants relief. These injuries are directly caused by Defendants' actions and inactions, and the relief sought herein would redress them. For example, this Court could broadly vacate the Hunting and Fishing Rule or more specifically enjoin the use of lead in certain areas to avoid impacts to listed species until the Service complies with the law. Plaintiff has no other adequate remedy at law.

24.    Defendant U.S. FISH AND WILDLIFE SERVICE is an agency within the Department of the Interior that administers the National Wildlife Refuge System and promulgated the Hunting and Fishing Rule. The Service is also charged with implementing the ESA's consultation requirement, 16 U.S.C. § 1536(a)(2).

25.     Defendant MARTHA WILLIAMS is the Principal Deputy Director of the U.S. Fish and Wildlife Service. Plaintiff sues Defendant Williams in her official capacity.

26.     Defendant U.S. DEPARTMENT OF THE INTERIOR is a Cabinet-level executive agency that manages America's vast natural resources, including lands within the National Wildlife Refuge System.

27.     Defendant DEB HAALAND is the Secretary of the U.S. Department of the Interior and has the ultimate responsibility to implement the ESA and administer the National Wildlife Refuge System. Plaintiff sues Defendant Haaland in her official capacity.

## LEGAL BACKGROUND

### The Endangered Species Act ("ESA")

28.     The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).

29.     The ESA vests primary responsibility for administering and enforcing the statute with the Secretaries of Commerce and Interior, who have delegated this responsibility to the National Marine Fisheries Service and the Service.

30.     Pursuant to Section 7(a)(2) of the ESA, "[e]ach federal agency shall, in consultation with the assistance of the Secretary insure that any action

authorized or funded, or carried out by such agency…is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" such species' critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. The consultation process requires that "each agency" use the "best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. Through the consultation process, federal agencies work with expert federal wildlife agencies, including the Service, to ensure that their actions do not jeopardize the survival of covered species. In this case, the acting agency and the consulting agency is the Service. Therefore, the Service was required to engage in an internal Section 7 consultation. *See* Section 7 Handbook.

31.     If the agency determines that such action "may affect" an endangered or threatened species, it must initiate Section 7 consultation detailing the potential "affects [on] the species or its critical habitat." 16 U.S.C. § 1536(b)(3)(A). Conversely, a "no effect" determination permits the action to move forward as planned without further consultation. *Id.* § 1536(b)(4); 50 C.F.R. § 402.14(b)(1). "Effects determinations" are based on the direct and indirect effects of the action when added to the environmental baseline and other interrelated and interdependent actions. 50 C.F.R. § 402.02 (defining "effects of the action" and broadly defining "action" as "all activities or programs of any kind authorized, funded or carried out by Federal agencies").

32.     Section 7(d) of the ESA, 16 U.S.C. § 1536(d), provides that once a federal agency initiates consultation on an action under the ESA, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section." These prohibitions remain in effect throughout the consultation period and until the federal agency has satisfied its obligation under Section 7(a)(2) to ensure the action will not result in jeopardy to the species or adverse modification of its critical habitat.

33.     To initiate or reinitiate consultation, the action agency must assess the impacts of the action on listed species and their habitat and provide all relevant information about such impacts to the expert wildlife agency. 50 C.F.R. § 402.14(c). The action agency can rely on "informal consultation" and does not have to undergo "formal consultation" if it determines that an action "may affect" but is "not likely to adversely affect" a listed species or its critical habitat and if the Service ultimately concurs in writing with that determination. 50 C.F.R. §§ 402.13, 402.14(b)(1).

34.     If the Service does not concur, or if the action agency has determined that the action is "likely to adversely affect" a listed species, the agencies must conduct a formal consultation. *Id*. § 402.14(a). The product of formal consultation

is a biological opinion in which the Service determines whether the agency action will jeopardize the survival and recovery of listed species or will destroy or adversely modify the species' critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.02 (definitions of "biological opinion" and "formal consultation").

35.    For federal programs that may affect listed species, such as the Service's nationwide Hunting and Fishing Rule, agencies must also engage in "programmatic consultation" to guide the implementation of such programs by establishing standards, guidelines, or governing criteria to avoid, minimize, or offset the effects of the program on listed species and critical habitat, and to establish protocols to track and respond to the collective impacts of actions taken pursuant to the program. *See* 50 C.F.R. § 402.02; *id*. § 402.14(c)(4) (requiring federal agencies to consider "the effects of the action or actions as a whole"). The Services' regulations provide that for federal programs, programmatic consultations, and project-specific consultations work in tandem, with each playing a vital role in protecting imperiled species. *See* 84 Fed. Reg. 44,976, 44,997 (Aug. 27, 2019).

36.    Not only does a Section 7(a)(2) consultation assist the action agency in discharging its duty to avoid jeopardy, but the biological opinion also affects the agency's obligation to avoid the "take" of listed species. Under ESA Section 9, 16 U.S.C. § 1538(a)(1)(B), it is illegal for any person—whether a private or

governmental entity—to "take" or otherwise "harm" any species listed under the ESA. *See* 16 U.S.C. § 1532(19) (defining "take"); 50 C.F.R. § 222.102 (defining "harm").

37.    As part of a consultation, the Service determines whether to authorize the take of listed species through the issuance of an incidental take statement, which insulates the federal agency from liability for a "take" of an endangered or threatened species, provided the agency complies with the statement's terms and conditions. 16 U.S.C. § 1536(b)(4).

**The National Environmental Protection Act ("NEPA")**

38.    NEPA is a procedural statute intended to ensure federal agencies consider the environmental impacts of their actions in the decision-making process.

39.    The regulations implementing NEPA are codified at 40 C.F.R. § 1500 et seq. The Council on Environmental Quality ("CEQ") issued amended NEPA regulations on July 16, 2020 but did not make them retroactive. The effective date of the new regulations was September 14, 2020.

40.    The Service's actions here are all subject to the previous CEQ regulations because the Service promulgated the Hunting and Fishing Rule prior to the effective date of the new regulations. As such, citations to the CEQ regulations herein are therefore to the governing regulations adopted in 1978.

41.    For "major Federal actions" that significantly affect "the quality of the

human environment," federal agencies must prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(2)(C).

42.     To determine whether an action is significant, CEQ regulations allow an agency to first prepare an Environmental Assessment ("EA"). 42 C.F.R. § 1501.4(b). CEQ regulations govern significance determinations, which require agencies to consider both the context of the action and the intensity of environmental impacts. *Id.* § 1508.27.

43.     If the agency determines that a full EIS is unnecessary, the agency prepares a Finding of No Significant Impact ("FONSI"). *Id*. § 1501.4(e). A FONSI is a "document…briefly presenting the reasons why [the proposed] action…will not have a significant effect on the human environment…" *Id.* § 1508.13.

44.     Pursuant to the CEQ regulations that were in effect when the decision at issue was made, the environmental analysis must disclose and analyze the direct, indirect, and cumulative effects of the proposed action on the environment. *Id.* §§ 1502.16 (environmental consequences), 1508.7 (cumulative impacts), 1508.8 (direct and indirect effects), 1508.25(c)(3) (scope of impacts that must be considered).

45.     The agency must take a "hard look" at these effects. *See Env'tl Prot. Info. Ctr. v. Blackwell*, 389 F.Supp.2d 1174, 1185 (9th Cir. 2004). "[A]n agency must take a hard look at cumulative impacts whether an EIS or EA is involved."

16

*Id.* Without sufficient justification, "general statements about possible effects and some risk" associated with cumulative impacts does "not constitute a hard look." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 491 (9th Cir. 2011).

46.     Cumulative impact is the impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions, regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time. 40 C.F.R. § 1508.7.

**Administrative Procedure Act ("APA")**

47.     Because NEPA and the ESA do not contain an internal judicial review provision, the APA governs judicial review. Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

**FACTUAL BACKGROUND**

**The National Wildlife Refuge System**

48.     The Refuge System is the nation's largest network of lands dedicated principally to the protection of nature. The Refuge System includes approximately

17

95 million acres of land and 760 million acres of submerged lands and waters as a sanctuary for our nation's wildlife.

49.     Congress established individual national wildlife refuges for a variety of purposes. For example, Congress established over 200 refuges to help fulfill treaty obligations to protect wildlife, such as birds under the Migratory Bird Treaty Act.

50.     Congress expressly directed that administration of the Refuge System promote endangered species conservation. The 1966 Refuge Administration Act directs the Service "to provide a program for the conservation, protection, restoration, and propagation of selected species of…fish and wildlife…threatened with extinction, and to consolidate, restate, and modify…present authorities relating to administration of the [Refuge System]." Such authorities include the Endangered Species Preservation Act of 1966 that authorized the Secretary to acquire lands to conserve species at risk of extinction and add the lands to the Refuge System. The Refuge System is essential to biodiversity. Many refuges are the only places in the world for species on the edge of extinction.

**The Hunting and Fishing Rule Massively Expands Hunting on the Refuge System**

51.     The Service annually reviews sport hunting and fishing programs on the Refuge System to determine whether to include additional stations or modify individual station regulations.

52.     In 2020, the Service proposed the largest-ever expansion of sport hunting and fishing on the Refuge System. Through its Hunting and Fishing Rule, the agency opened, for the first time, eight refuges that were previously closed to sport hunting and fishing. The Hunting and Fishing Rule expanded hunting and fishing on 2.3 million acres in 147 wildlife refuges and national fish hatcheries across the United States. The agency described the Hunting and Fishing Rule as the "single largest expansion of hunting and fishing opportunities" in history. Specifically, the Hunting and Fishing Rule opened or expanded 859 hunting and fishing opportunities (an "opportunity" is defined as one species on one field station in one state).

53.     The Center submitted comments on the overarching proposed rule and numerous individual stations. Despite the concerns raised by the Center and others, the Service made few changes to their proposal.

54.     Over time, the Service has continually expanded sport hunting and fishing in the Refuge System. For example, prior to promulgation of the Hunting and Fishing Rule, in 2019, the Service added new hunting and fishing opportunities at 77 national wildlife refuges and 15 national fish hatcheries. These additions added new hunting and fishing opportunities to more than 1.4 million acres nationwide. In 2016, the Service expanded hunting and fishing opportunities on 13 refuges and opened elk hunting in Colorado for the first time in history.

Most recently, on August 30, 2021, a further expansion was announced and described again as the "largest expansion of outdoor recreation" in history. This pattern of expanding sport hunting and fishing of wildlife and allowing the use of lead ammunition on the nation's national wildlife refuges is likely to continue, and with these expansions the amount of toxic lead present on national wildlife refuges continues to accumulate.

**Impacts of Use of Lead Ammunition and Tackle**

55.     Lead is a heavy metal that has been historically the primary metal used for ammunition in hunting and in fishing tackle because of its malleability. But lead is an extraordinarily toxic element that does not break down in the environment. Alternatives to lead, such as copper bullets, are readily available.

56.     Sport hunting and fishing that allow the use of lead ammunition and tackle, as in the Hunting and Fishing Rule, can result in widespread and uncontrolled introduction of toxic lead into the environment and significant toxic lead exposure for wildlife.

57.     Animals that scavenge hunter-killed carcasses are at high risk of encountering severely toxic concentrations of lead. Studies in 2006 and 2009 evaluated radiographic evidence of lead fragments in 38 deer killed by hunters using center fire rifles with lead-based copper jacketed bullets. Ninety-four percent of samples contained fragments of lead, as did ninety percent of offal piles. Metal

fragments were found to be broadly distributed along wound channels. The authors of these studies concluded that the data demonstrated a high potential for exposure to lead by scavenging wildlife. Animals that consume lead particles that have fragmented in hunter-killed carcasses may be at a particular risk of lead poisoning because the small size and irregular shape of fragments make them more absorbable in the digestive process.

58.    Additionally, waterbirds are often poisoned by lead after ingesting lead tackle or jigs used when fishing. This is because anglers attach lead weights, called sinkers, to fishing lines to sink the hook, bait, or lure into the water. Some anglers use lead-weighted hooks called jigs. A sinker or jig can accidentally detach from a line and fall into the water, or the hook or line may become tangled and the line may break or be cut. Many waterbirds forage for food in the mud at the bottom of lakes. Most of these birds also swallow small stones and grit that aid in grinding up their food, and some of the grit may contain lead from fishing tackle. The U.S. Environmental Protection Agency ("EPA") found that over 75 individual species are potentially at risk from exposure to lead from fishing sinkers based on their feeding habits and sources of food.

59.    The federally protected whooping crane occurs in many refuges at issue in this Complaint. Whooping cranes are particularly susceptible to exposure to lead because of their feeding and behavioral patterns, such as feeding in marshy

and shallow waters and ingesting whatever they find. The EPA has reported on the danger of lead to cranes, finding that because they "wade in shallow areas of inland and coastal aquatic habitats searching for prey…dig[ging] into the sediment with their bills to extract food" they may "ingest lead fishing sinkers." And like other birds, whooping cranes ingest lead tackle, shot, or lead fragments with grit, which causes poisoning and death.

**The Service Recognizes the Harmful Effects of Lead But Allows its Use on National Wildlife Refuges**

60.   Although the Service discusses the effects of lead in some of the environmental assessments referenced in this Complaint, these discussions are general statements nearly always confined to raptors like bald eagles. The agency does not discuss the effects of lead on other protected species, like whooping cranes, and the agency never looks at the adverse health impacts of lead tackle on birds like whooping cranes.

61.   In the early 1990s, these and other significant adverse impacts from lead exposure prompted the Service to enact nationwide prohibitions on the use of lead shot for waterfowl hunting. 50 C.F.R. § 2021(j)(2); 50 C.F.R. § 20.134 ("[w]e will not approve as nontoxic any shot type or shot coating with a lead content of 1 percent or more"). Even so, the use of lead ammunition has not been prohibited nationally for hunting mammals and other birds on national wildlife refuges, although some specific refuges have chosen to do so individually. As such, lead

continues to accumulate on refuges. For instance, the Service found that the ban for waterfowl hunting did not eliminate "lead shot exposure in waterfowl" and that "lead shot remain[s] on the landscape." They also found that all "lead bullets fragment" and sometimes they "substantially" fragment.

62.     Based on these and other findings, in 2017, the agency proposed to phase out all lead ammunition on the Refuge System. *See* Director's Order No. 219 (Use of Nontoxic Ammunition and Fishing Tackle). The Service found that the "[e]xposure to lead ammunition and fishing tackle has resulted in harmful effects to…wildlife" and that hunting with lead ammunition poses "an ongoing risk to upland or terrestrial migratory birds and other species that ingest spent shot directly from the ground or as a result of predating or scavenging carcasses that have been killed with lead ammunition and left in the field." *Id.*

63.     In 2017, the Service revoked the order on the use of nontoxic ammunition and fishing tackle based on the determination that it was "not mandated" and did not follow adequate "coordination with affected stakeholders." Accordingly, despite the Service's acknowledgement of the risks to wildlife from lead poisoning, the Service's failure to nationally prohibit hunting and fishing with lead ammunition and tackle continues to cause lead to accumulate in refuges.

**The Service Disregards the Harmful Impacts of the Hunting and Fishing Rule's Expansion of Lead Use**

64.     The Service's documentation supporting the Hunting and Fishing Rule includes a Cumulative Impacts Report ("CIR"). The CIR determined that the Hunting and Fishing Rule would have no significant cumulative impacts from its authorized use of lead ammunition and tackle. The agency's analysis of cumulative impacts of lead is limited to two paragraphs and relies on conclusions that contradict their own public media statements that the Hunting and Fishing Rule is the largest hunting and fishing expansion in recent history, stating that "the number of new hunters or anglers expected to be using lead bullets or lead tackle as a result of the new or expanded opportunities are expected to be very low and, [sic] so the resulting addition of lead into the environment was negligible or minor."

65.     The Service prepared environmental assessments pursuant to NEPA for most of the refuges that expanded hunting or fishing. In individual environmental assessments that discuss lead, the agency's analysis is brief and usually refers to raptors, without analyzing effects on other protected species like the jaguar, ocelot, jaguarundi, Audubon's crested caracara, wood stork, and whooping crane. Neither the CIR not the individual environmental assessments provide any analysis of past, ongoing, or future use of lead outside of the refuge, nor do they analyze how that outside use added to use in the refuges, accumulated over time, and could lead to direct, indirect, or cumulative impacts.

66.     The CIR relied on the statement that "[n]one of the [individual environmental assessments] or [categorical exclusions] reviewed identified any significant adverse cumulative impacts to the environment." Yet none of the environmental assessments in this Complaint or categorical exclusion consider or acknowledge that lead tackle and shot can poison waterbirds or endangered mammalian scavengers, let alone provided any analysis of direct, indirect, or cumulative effects.

**Impacts to the Grizzly Bear on Swan River National Wildlife Refuge**


Photo © Robin Silver

67.     The Swan River NWR, located in Lake County, Montana, was created in 1973 at the request of Senator Lee Metcalf, who wanted to see the area preserved for future generations. This 1,568-acre refuge is part of the Benton Lake NWR Complex. It was established under the authority of the Migratory Bird

Conservation Act of 1929 to, among other purposes, provide habitat for migratory birds.

68.     Swan River NWR supports a variety of wildlife species, including trumpeter swans, cinnamon teal, marsh wrens, white-tailed deer, and grizzly bears. The grizzly bear is protected under the ESA as a threatened species. Grizzly bears are generally solitary animals and have one of the lowest reproductive rates among terrestrial mammals.

69.     The Hunting and Fishing Rule opened Swan River NWR to black bear hunting, an activity that has never been allowed at this refuge. Hunting black bears is limited to the fall season and restricted to archery-only hunts. Swan River NWR is in a region of Montana that accounts for about half of the black bear harvest for the entire state.

70.     Grizzly bears reside in the Swan River Valley, the area where Swan River NWR is located. Grizzlies use the Mission and Swan mountain ranges of Montana as habitat and Swan River NWR provides a corridor for grizzlies to access the two ranges. Grizzlies are occasionally observed at Swan River NWR in the spring and summer seasons.

71.     The Service conducted only an informal internal Section 7 consultation for the Swan River NWR and found that the Hunting and Fishing Rule

is not likely to adversely affect grizzly bears and, on that basis, avoided the preparation of a biological opinion following formal consultation.

72.     Specifically, the Service noted the Hunting and Fishing Rule may lead to grizzly bear deaths because grizzlies are "occasionally mistaken for black bears and killed during bear season." The Service dismissed the risk without imposing mitigation measures because "only 3 percent of all [grizzly bear] mortalities" are due to hunter misidentification and grizzly bear deaths in the area are therefore "sustainable." The Service determined that archery hunters are more likely to identify black bears correctly than other hunters, leading to only a "minor" negative effect, even while acknowledging grizzly bears may killed by archers in the area. In addition, the Service completely ignored the effects of self-defense killings. The risk of a hunter killing a grizzly bear in self-defense is increased with close encounters, as required with archery hunting.

## Impacts to the Jaguar on Leslie Canyon National Wildlife Refuge

73.     Leslie Canyon NWR, located in Cochise County, Arizona, near the international border with Mexico, was created in 1988. This 2,765-acre refuge, with an additional 15,575 acres in conservation easements, was established under the authority of the ESA of 1973 and the Fish and Wildlife Act ("FWA") of 1956 to conserve listed species.

74.    This refuge was specifically established to protect fish of the Río Yaqui watershed and is primarily managed for the benefit of federally listed threatened and endangered fish and frog species. It is also an important habitat for migratory and nesting birds, and more than 340 species of birds are present at Leslie Canyon NWR. It is home to a unique velvet ash-black walnut-cottonwood forest vital to many rare species.

75.    Within the past five years, there have been several sightings of the federally protected jaguar near Leslie Canyon NWR in the Chiricahua Mountains. Jaguars are the only living member of the genus *Panthera.* The jaguar's activity coincides with that of its prey, and it hunts both terrestrial and aquatic animals. The jaguar is a scavenger that consumes carrion. Many of the species the jaguar consumes can be hunted at Leslie Canyon NWR.

76.    The Hunting and Fishing Rule opened migratory bird, upland game, and big game hunting for the first time at this refuge. Leslie Canyon NWR does not have restrictions on the use of lead ammunition when hunting (other than federal requirements for non-toxic shot for waterfowl). Although the refuge encourages non-toxic ammunition, its use is voluntary. Thus, the Hunting and Fishing Rule expands use of lead on the refuge, increasing the risk to jaguars.

77.    The Service has documented recent sightings of a jaguar near the refuge. Finding that the jaguar has been sighted in "close proximity" to Leslie

Canyon NWR and has been documented "wander[ing]" onto the refuge, the Service acknowledged that jaguars "have large territories" and that "there is a possibility that [Leslie Canyon NWR] is a part of this individual's territory."

78.   The Service conducted only an informal internal Section 7 consultation for the Leslie Canyon NWR and found that the Hunting and Fishing Rule is not likely to adversely affect jaguars and, on that basis, avoided the preparation of a biological opinion following formal consultation.

79.   The Service's consultation did not consider the risk to jaguars scavenging on lead-contaminated carcasses in Leslie Canyon NWR. A complete examination of the effects of this activity would show the likelihood of adverse impacts to jaguars due to exposure to lead.

80.   The Service determined that its mitigation measures would eliminate any likelihood of adverse effects to jaguars. The agency underscored that the Hunting and Fishing Rule does not allow mountain lion hunting or hunting at night, and that hunting is only seasonal. Yet these mitigation measures do not address the likely scenario that a jaguar could prey on an animal that has been exposed to lead or eat a carcass that has been contaminated with lead.

81.   In the environmental assessment for Leslie Canyon NWR and the CIR for the Hunting and Fishing Rule, the Service found no significant cumulative impacts under NEPA. The agency did not consider that past, ongoing, and future

lead use on and off the refuge could have cumulative impacts on this wide-ranging species. If the Service would have taken the requisite "hard look" at the direct, indirect, and cumulative impacts of lead use on the Leslie Canyon NWR, it would have found significant impacts to the jaguar. These endangered scavengers can ingest lead when feeding on carcasses or prey contaminated with lead and even a small exposure can lead to impairment or death.

**Impacts to the Ocelot and the Jaguarundi on Laguna Atascosa National Wildlife Refuge**

82.     Laguna Atascosa NWR, located in Cameron County, Texas, was created in 1946. This 100,000-acre refuge was established under the authority of the Migratory Bird Conservation Act of 1929, Transfer of Certain Real Property for Wildlife Conservation Purposes Act of 1948, and the FWA of 1956 for use as "an inviolate sanctuary, or for any other management purpose, for migratory birds" and for the conservation and enhancement of wildlife species. Laguna Atascosa NWR also provides opportunities for wildlife-dependent recreation to the public.

83.     This refuge is important to its rare animals and receives extensive use because it is one of the top birding destinations in the nation, with more bird species than any other refuge. It is the largest protected area of natural habitat in the Rio Grande Valley. Laguna Atascosa NWR is home to unique wildlife species, including many protected animals like the ocelot, jaguarundi, northern aplomado falcon, piping plover, red knot, and the eastern black rail.

84.   The ocelot is protected under the ESA as an endangered species. Laguna Atascosa NWR is home to one of only two known populations of ocelot in the United States. The ocelot is a wide-roaming, slow moving, and crepuscular cat. There are less than 100 ocelots left in the United States and they are found in areas affected by the Hunting and Fishing Rule. The ocelot eats a variety of meat, including animals that can be hunted by humans at Laguna Atascosa NWR refuge.

85.   The jaguarundi is protected under the ESA as an endangered species. Laguna Atascosa NWR provides suitable habitat for this species and it has been sighted near the refuge. The jaguarundi is a unique, medium-sized wild cat that resembles a large weasel. There may be less than 15 jaguarundis in Texas. They are opportunistic hunters that eat small prey including birds, reptiles, and mammals. They can also consume larger prey and carrion.

86.   The Hunting and Fishing Rule opened alligator, feral hog, and nilgai hunting on acres already open to hunting at Laguna Atascosa NWR. Specifically, it provides a public big game hunt for white-tailed deer, nilgai antelope, feral hogs, other exotic ungulates, and American alligators on the Laguna Atascosa Unit, Bahia Grande Unit, and the La Selva Verde Unit, for a total of 45,086 acres open to hunting—almost half of the entire refuge. There is no prohibition on lead use in Texas while hunting upland species and Laguna Atascosa NWR does not have lead-specific rules for sport hunting or sport fishing. Thus, the Hunting and Fishing

Rule expands use of lead on the refuge, increasing the risk to the ocelot and jaguarundi.

87.     The ocelot is found in areas that have been opened to hunting under the Hunting and Fishing Rule. Specifically, the ocelot uses the refuge's lomas, a type of ecosystem comprised of islands of vegetation. The ocelot finds food, shelter, and protection within the lomas. The Service's environmental documents note that although hunters "typically" avoid dense brush areas like lomas, they "hunt adjacent to these areas and drive…in areas of known ocelot presence."

88.     Because it likes dense brush and cordgrass habitats, the jaguarundi may also occur in areas that have been opened to hunting under the Hunting and Fishing Rule.

89.     The Service conducted only an informal internal Section 7 consultation for the Laguna Atascosa NWR and found that the Hunting and Fishing Rule is not likely to adversely affect the ocelot or the jaguarundi and, on that basis, avoided the preparation of a biological opinion following formal consultation.

90.     A primary threat to ocelots is vehicle strikes. The Service states that even when following speed limits, vehicle use poses a threat, explaining that "[t]he public vehicle use in these areas is a risk and danger to ocelots even if drivers are operating at a slow speed and being cautious" and that there is a "concern"

regarding the introduction of vehicles "where wildlife species are not accustomed to that disturbance." The Service also states that the refuge has not studied the effects of ocelot movements during hunts but that no adverse effects have been "documented." The agency relies on speed limits at the refuge to dismiss the risk of vehicle strikes, even though they found that when drivers operate "at a slow speed" and are "cautious," vehicles still pose a "risk" and "danger" to ocelots. The biological evaluation makes clear that vehicle collisions are the "largest cause of known ocelot mortalities" and so it follows that an increase in "vehicle activity within areas of ocelot occupancy has the potential to increase the risk of ocelots getting hit by vehicles."

91.     Vehicle strikes also threaten the jaguarundi. Although these animals have not been sighted at the refuge recently, they have been sighted locally and "suitable habitat exists" on the refuge where hunts may be occurring. Therefore, it is possible that a jaguarundi may venture onto Laguna Atascosa NWR during a hunt and be struck by a vehicle.

92.     The agency did not consider lead impacts on the ocelot or jaguarundi. The agency's own documents note that ocelots feed on carcasses. Ocelots also prey on small animals, including birds and fish that may have ingested lead. The jaguarundi is an opportunistic hunter that may consume prey that has ingested lead or carrion shot using lead ammunition.

93.     In the environmental assessment for Laguna Atascosa NWR and the CIR for the Hunting and Fishing Rule, the Service found no significant cumulative impacts under NEPA. The agency did not consider that past, ongoing, and future lead use on and off the refuge could have cumulative impacts on these wide-ranging species. If the Service would have taken the requisite "hard look" at the direct, indirect, and cumulative impacts of lead use on the Laguna Atascosa NWR, it would have found significant impacts to the ocelot and jaguarundi. These endangered predators can ingest lead when feeding on carcasses and even a small exposure to lead can lead to impairment or death.

## Impacts to Audubon's Crested Caracara and the Wood Stork on the Everglades Headwaters National Wildlife Refuge

94.     Everglades Headwaters NWR, located in the Lake Okeechobee watershed of south-central Florida, was created in 2012. This refuge includes 3,854 acres and was established under the authority of the ESA of 1973 and the National Wildlife Refuge System Administration Act of 1966. The main missions of this refuge include supporting a functional conservation landscape; providing habitat for fish and wildlife; enhancing water quantity, quality, and storage; and offering wildlife-dependent recreation and education.

95.     Everglades Headwaters NWR is one of the newest refuges added to the Refuge System. It contains an array of wildlife species and specialized habitats, such as pine flatwoods—a habitat unique to Florida and home to rare wildlife

including Audubon's crested caracara, blue tailed mole skink, Britton's beargrass, eastern indigo snake, Florida bonneted bat, and the wood stork.

96.     Audubon's crested caracara is protected under the ESA as a threatened species. It is a long-legged raptor with distinct colors on its face. When it feels unsafe, the bird's face changes to a pumpkin-color and then recedes to a light yellow. These scavengers make a unique cackling cry in the early morning. They are opportunistic feeders that hunt live prey and consume carrion. The Audubon's crested caracara's diet includes animals that are hunted at this refuge.

97.     The wood stork is protected under the ESA as a threatened species. Wood storks are large, long-legged, tropical wading birds and the only stork population that breeds in the United States. They are present at Everglades Headwaters NWR from the spring until the winter. The wood stork feeds by sticking its beak in shallow waters and snapping up its prey.

98.     The Hunting and Fishing Rule opened migratory bird, upland game, big game hunting, and sport fishing for the first time at Everglades Headwaters NWR, in alignment with state regulations. The areas opened for hunting and fishing include the entire 395-acres of the Arbuckle Unit, the entire 1,460-acres of the Hatchineha Unit, and the entire 1,999-acres of the Okeechobee Unit. Everglades Headwaters NWR does not include any prohibitions on the use of lead ammunition or lead tackle, and it allows the use of off-road vehicles for hunting

and fishing, which can carry lead and create lead exposure deep into the refuge. Thus, the Hunting and Fishing Rule expands use of lead on the refuge, increasing the risk to Audubon's crested caracara and the wood stork.

99.     Audubon's crested caracara occurs in at least one unit opened to hunting—the Hatchineha Unit. It has been observed foraging in the Hatchineha Unit, a mixed habitat of pine flatwoods, mixed hardwoods, sand pine scrub, and freshwater marshes. The wood stork occurs in all three units opened to hunting.

100.    The Service conducted only an informal internal Section 7 consultation for the Everglades Headwaters NWR and found that the Hunting and Fishing Rule is not likely to adversely affect Audubon's crested caracara or the wood stork, and on that basis, avoided the preparation of a biological opinion following formal consultation.

101.    The Service did not discuss the effects of lead in either its biological evaluation or environmental assessment for these species. The Service did not consider that Audubon's crested caracara could feed on a hunter-killed carcass that has been contaminated with lead or that both birds could be exposed to lead from tackle if they feed near the freshwater marshes where fishing occurs.

102.    The Service also provided no supporting analysis to justify its conclusion that the wood stork would not be adversely impacted from disturbance caused by the hunting expansion, even though consultation documents from other

refuges recognize that wood storks are particularly susceptible to disturbance. *See, e.g.*, Section 7 Intra-Service Consultation for Arthur R. Marshall Loxahatchee National Wildlife Refuge (July 23, 2018) at 295 ("Wood storks are more sensitive to disturbance than other wading birds and exhibit a greater flushing distance when foraging than when nesting."). The Hunting and Fish Rule increases disturbance on the refuge by increasing human presence, traffic, and noise.

103.    In the environmental assessment for Everglades Headwaters NWR and the CIR for the Hunting and Fishing Rule, the Service found no significant cumulative impacts under NEPA. The agency did not consider that past, ongoing, and future lead use on and off the refuge could have cumulative impacts on the Audubon's crested caracara and wood stork. If the Service would have taken the requisite "hard look" at the direct, indirect, and cumulative impacts of lead use on the Everglades Headwaters NWR, it would have found significant impacts to these species, as even a small exposure to lead can lead to impairment or death.

**Impacts to the Wood Stork on St. Marks National Wildlife Refuge**

104.    St. Marks NWR, located in Wakulla, Jefferson, and Taylor counties, Florida, was created in 1931. It includes over 80,000 acres and is one of the oldest refuges in the United States. It is part of the North Florida Refuges Complex and was established primarily to provide wintering habitat for migratory birds.

105.    This refuge includes coastal marshes, islands, tidal creeks, and estuaries of seven north Florida rivers. It is home to a variety of wildlife including rare and protected bird species like the wood stork.

106.    The Hunting and Fishing Rule expands existing upland game and big game hunting to new acres and expands the method of take for existing upland game and big game hunting. Specifically, it adds an additional 3,081 acres for white-tailed deer, turkey, squirrel, rabbit, raccoon, and feral hog hunting. It also adds centerfire weapons as a method of take for feral hogs during small game season on 33,996 acres on the Panacea, Wakulla, and Aucilla Hunt Units and 12,180 acres on the Newport Hunt Unit. Lead shot is allowed at St. Marks except for waterfowl, and thus the Hunting and Fishing Rule expands use of lead on the refuge, increasing the risk to wood storks.

107.    The Service did not conduct informal consultation for the St. Marks NWR. Based on its unreasonable conclusions that the Hunting and Fishing Rule would have "no effect" on endangered wildlife and that a categorical exclusion applied, the agency did not prepare a biological evaluation or an environmental assessment. The Service provided no supporting analysis to justify its conclusions, even though consultation documents from other refuges recognize that wood storks are particularly susceptible to disturbance, and despite the fact that the Hunting and Fishing Rule's increase in lead use on the refuge risks poisoning wood stork.

108.    In addition to accumulation of lead from past use of lead ammunition on and off the refuge, and the Hunting and Fishing Rule's expanded use of lead ammunition, St. Marks is open to fishing year-round and allows lead tackle, with about 2,000 acres open to bank-fishing and about 32,000 acres of bay/estuary open to salt-water fishing. Because of this, lead will continue to accumulate at St. Marks and provide additional routes of exposure to the wood stork.

109.    If the Service would have taken the requisite "hard look" at direct and indirect effects of lead use on the St. Marks NWR, as well as the cumulative impacts of past, ongoing, and future lead use, it would have found significant impacts to the wood stork. These endangered birds can ingest lead shot scattered in the environment or lead tackle in waterways, and even a small exposure of lead can lead to impairment or death.

**Impacts to the Whooping Crane at Kirwin National Wildlife Refuge**



Photo © Robin Silver

110.    Kirwin NWR, located in central Kansas, an overlay of the Kirwin Reservoir, was created in 1954. This 10,778-acre refuge was established under the authority of the Migratory Bird Conservation Act of 1929 and the FWA of 1956. One of its main purposes is to conserve, maintain, and manage wildlife on behalf of the National Migratory Bird Management Program.

111.    The refuge's habitat includes a combination of prairies and plains that support wildlife that rely on both habitats. The refuge includes many rare and protected species, including whooping cranes. Kirwin NWR is a major stopover area for whooping cranes in both the spring and fall. The Service noted that whooping cranes are one of the "rarest" species and that the population at Kirwin NWR "is the only naturally migrating population of whooping cranes in the world" with "slightly more than 500 individuals in the population." Moreover, the agency determined that "whooping cranes represent the greatest concern of any listed species in terms of risk associated with hunting seasons" at Kirwin NWR and that the bird's migration patterns "can coincide with many of the fall hunting seasons that extend into December, and the spring light goose conservation order."

112.    The whooping crane is protected under the ESA as an endangered species. They are named after their loud "whooping" call, are the largest North American bird, and one of only two crane species native to the United States. Whooping cranes feed in marshy and shallow waters and ingest whatever they find

by probing waters with their bills. They use small stones, seed, or grain, called

"grit" to grind up their food. Because of their unique feeding and behavioral habits,

these birds are particularly susceptible to lead. They have been documented

accidentally ingesting lead shot, bullet fragments, and lead sinkers/tackle. They

have also been documented ingesting lead through contaminated prey, and have

been shown to have elevated lead bone, tissue, or blood levels from lead

ammunition.

113.    The Hunting and Fishing Rule expands the animals that are allowed to

be taken at Kirwin NWR to include woodcock, rail, badger, bobcat, coyote, fox,

furbearer, opossum, raccoon, and skunk; expands existing squirrel and rabbit

hunting; expands existing turkey hunting to new acres; and expands sport fishing

to new acres.

114.    Although Kirwin NWR prohibits lead ammunition for all hunting

activities, it allows lead tackle when fishing, including lead sinkers, which

whooping cranes have been documented to ingest, leading to lead poisoning. The

Hunting and Fishing Rule opened 1,360 acres to fishing with motorized boats on

Kirwin NWR. Thus, the Hunting and Fishing Rule expands use of lead tackle on

the refuge, increasing the risk to whooping cranes.

115.    The Service conducted only an informal internal Section 7

consultation for the Kirwin NWR and found that the Hunting and Fishing Rule will

have no effect on whooping cranes and, on that basis, avoided the preparation of a biological opinion following formal consultation. The Service did not discuss the threats of lead tackle on whooping cranes in its biological evaluation. Because the refuge allows lead when fishing, the expanded fishing opportunities at Kirwin NWR will add more lead to the environment.

116.    In the environmental assessment for Kirwin NWR and the CIR for the Hunting and Fishing Rule, the Service found no significant cumulative impacts under NEPA.

117.    The agency did not consider the cumulative impacts from adding even small amounts of lead, given that the use of lead tackle has been expanded at Kirwin NWR. The Kansas Department of Wildlife & Parks does not prohibit lead tackle and instead advertises lead tackle vendors on their official website, thereby promoting the use of lead. In addition, past use of lead in hunting, through spent lead and fragmented lead bullets, pose a threat on and off the refuge. Moreover, some hunters continue to use lead shot at Kirwin NWR in violation of the refuge's rules and federal requirements for non-toxic shot for waterfowl. Because of these facts, the presence of lead on and off the refuge will continue to increase and provide additional routes of exposure to whooping cranes.

118.    If the Service would have taken the requisite "hard look" at the indirect and direct effects of lead use on the Kirwin NWR, as well as the

cumulative impacts of past, ongoing, and future lead use, it would have found significant impacts to whooping cranes. These endangered birds can ingest lead shot scattered in fields or lead tackle in waterways, and even a small exposure to lead can lead to impairment or death.

**Impacts to the Whooping Crane at Patoka National Wildlife Refuge**

119.   Patoka NWR, located in Oakland City, Indiana, was created in 1994. This 22,472-acre refuge was established for various conservation purposes under the authority of the Emergency Wetlands Resources Act of 1986, the Act Authorizing the Transfer of Certain Real Property for Wildlife, and the North American Wetlands Conservation Act.

120.   The refuge's habitat includes 12,700 acres of wetlands and giant cane, the only type of bamboo native to the United States. It is an important bird habitat and home to whooping cranes. About twelve whooping cranes from an experimental flock raised in Wisconsin use Patoka NWR as a wintering site.

121.   The Hunting and Fishing Rule opened crow, pheasant, and skunk hunting on new acres and acres already open to other hunting, and expanded existing migratory bird, upland game, big game, and sport fishing to new acres. The refuge allows the use of lead ammunition for hunting big game and furbearers and lead tackle when fishing. Thus, the Hunting and Fishing Rule expands use of lead on the refuge, increasing the risk to whooping cranes. In contrast, another

refuge in Indiana with whooping cranes, Muscatatuck National Wildlife Refuge, bans lead ammunition and tackle in part to protect these vulnerable birds from poisoning.

122.    The Service conducted only an informal internal Section 7 consultation for the Patoka NWR and found that the Hunting and Fishing Rule is not likely to adversely affect whooping cranes, despite the increase in lead use that risks poisoning whooping cranes. On the basis of its incorrect finding that the Hunting and Fishing Rule is not likely to adversely affect whooping cranes, the Service avoided the preparation of a biological opinion following formal consultation.

123.    Even though the agency discusses the general dangers of lead and cites to the refuge's practice of encouraging hunters and anglers to use non-toxic products, the agency ignores the risk posed by lead tackle, and in particular, the increased risk to whooping cranes because of their feeding and behavioral habits. In the environmental assessment for Patoka NWR and the CIR for the Hunting and Fishing Rule, the Service found no significant cumulative impacts under NEPA. But the agency did not consider the cumulative impacts from adding even small amounts of lead, given that lead tackle has never been prohibited at Patoka NWR. The agency did not consider the cumulative effects of the Hunting and Fishing Rule's expanded lead use when added to the past accumulation of lead on the

refuge. Moreover, because the state of Indiana does not prohibit lead tackle, the presence of lead on and off the refuge will continue to increase at Patoka NWR and provide additional routes of exposure to whooping cranes.

124.   If the Service would have taken the requisite "hard look" at the indirect and direct effects of lead use on the Patoka NWR, as well as the cumulative impacts of past, ongoing, and future lead use, it would have found significant impacts to whooping cranes. These endangered birds can ingest lead shot scattered in fields or lead tackle in waterways, and even a small exposure to lead can lead to impairment or death.

**Impacts to Whooping Crane on Lacreek National Wildlife Refuge**

125.   Lacreek NWR, located in Bennett County in South Dakota, was created in 1935. This 16,410-acre refuge was established by President Franklin D. Roosevelt through Executive Order No. 7160 "as a refuge and breeding ground for migratory birds..." It provides habitat for an array of species, including bald eagles, shorebirds, and whooping cranes.

126.   The Hunting and Fishing Rule increased the areas open to waterfowl hunting from 220 acres to approximately 5,100 acres and increased the total acreage allowed for hunting from 8,700 to 11,500 acres. Specifically, it opened coyote, bobcat, fox, greater prairie chicken, rabbit, and mountain lion hunting on acres already open to hunting and expanded existing migratory bird, upland game,

and big game hunting to new acres. The Hunting and Fishing Rule increased the number of species allowed to be hunted from 12 to 18 and included sandhill cranes, which may occur in flocks with endangered whooping cranes. Lacreek NWR allows the use of lead shot when hunting big game predators and cottontail rabbit, and thus the Hunting and Fishing Rule expands use of lead shot on the refuge, increasing the risk to whooping cranes.

127.    Whooping cranes are occasionally observed at Lacreek NWR during migration and may occur in the wetlands or shallow meadows during hunting season.

128.    The Service conducted only an informal internal Section 7 consultation for the Lacreek NWR and found that the Hunting and Fishing Rule is not likely to adversely affect whooping cranes, without considering the increase in lead use that risks poisoning whooping cranes. The Service also ignored the risk that hunters targeting sandhill cranes may accidentally shoot endangered whooping cranes. On the basis of its incorrect finding that the Hunting and Fishing Rule is not likely to adversely affect whooping cranes, the Service avoided the preparation of a biological opinion following formal consultation.

129.    While the Service does not discuss impacts from the use of lead ammunition on whooping cranes, the agency acknowledged the other dangers of lead, including that lead "can be present in gut piles left by deer hunters after field

dressing" and that animals "feed on gut piles and may ingest the lead, leading to poisoning." The agency did not consider impacts from ingestion of spent lead shot scattered across the refuge.

130.    The agency noted that whooping cranes may occur in the wetlands or shallow meadows at Lacreek NWR during hunting seasons. However, it determined that the Hunting and Fishing Rule would not be likely to adversely affect the whooping crane because they are likely to use wetlands in hunting areas "only when hunting pressure is low or at night." However, even if this is true, it follows that whooping cranes are still at risk of ingesting lead shot because they will still be present in hunting areas, even if they occur when there is "low" hunting pressure or at night.

131.    In the environmental assessment for Lacreek NWR and the CIR for the Hunting and Fishing Rule, the Service found no significant cumulative impacts under NEPA. The agency did not consider the cumulative impacts from adding even small amounts of lead given that lead shot continues to be allowed in the refuge. The agency did not consider the past, ongoing, and future presence of lead on and off the refuge. Because the state of South Dakota only prohibits lead shot when hunting waterfowl and mourning doves, its presence on and off the refuge will continue to increase. And the many hunting opportunities that allow lead shot at this refuge will provide additional routes of exposure to whooping cranes.

132.    If the Service would have taken the requisite "hard look" at the

indirect, direct, and cumulative impacts of lead use on the Lacreek NWR, it would

have found significant impacts to whooping cranes. These endangered birds can

ingest lead shot scattered in fields or lead tackle in waterways, and even a small

exposure to lead can lead to impairment or death.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Violations of the ESA

133.    Plaintiff re-alleges the allegations in all preceding paragraphs.

134.    The ESA requires federal agencies to ensure, through a consultation

process, that their actions will not jeopardize listed species' survival or adversely

modify their designated critical habitat. To fulfill this duty, the Service must

initiate and complete adequate project-specific ESA Section 7 consultation on the

refuges at issue in this Complaint, as well as programmatic consultation on the

nationwide Hunting and Fishing Rule.

135.    The ESA mandates that the Service use the best available science in

making Section 7 determinations.

136.    In its consultation for the Swan River NWR, the Service failed to

adequately consider the impacts of mistaken identity shootings, entirely failed to

consider the impacts of self-defense shootings, and arbitrarily determined that the

Hunting and Fishing Rule would not be likely to adversely affect the grizzly bear.

137.    In its consultation for the Leslie Canyon NWR, the Service failed to consider the impacts of lead and arbitrarily determined that the Hunting and Fishing Rule would not be likely to adversely affect the jaguar.

138.    In its consultation for the Laguna Atascosa NWR, the Service failed to adequately consider the severity of impacts of vehicle strikes, entirely failed to consider impacts of lead, and arbitrarily determined that the Hunting and Fishing Rule would not be likely to adversely affect the ocelot and the jaguarundi.

139.    In its consultation for the Everglades Headwaters NWR, the Service failed to consider the impacts of lead and arbitrarily determined that the Hunting and Fishing Rule would not be likely to adversely affect Audubon's crested caracara and wood stork.

140.    The Service did not conduct a consultation for the St. Marks NWR and thus failed to analyze the impacts of noise and other disturbance from increased hunting and arbitrarily determined that the Hunting and Fishing Rule had no effect on the wood stork.

141.    In its consultation for the Kirwin NWR, the Service failed to consider the impacts of lead tackle in its consultation and arbitrarily determined that the Hunting and Fishing Rule would have no effect on the whooping crane.

142.    In its consultation for the Patoka NWR, the Service failed to consider the impacts of lead and arbitrarily determined that the Hunting and Fishing Rule would not be likely adversely affect the whooping crane.

143.    In its consultation for the Lacreek NWR, the Service failed to consider the risk of sandhill crane hunters accidentally shooting endangered whooping cranes, ignored the impacts of lead on whooping cranes, and arbitrarily determined that the Hunting and Fishing Rule would not be likely to adversely affect the whooping crane.

144.    The Service must also consult on the nationwide Hunting and Fishing Rule as a whole. *See* 50 C.F.R. § 402.14(c)(4). The Hunting and Fishing Rule expands hunting and fishing on numerous refuges across the country and thereby increases the risk to listed species using these refuges. Specifically, the Hunting and Fishing Rule increases use of lead ammunition and tackle, as well as noise, traffic, and other disturbance associated with hunting and fishing. The Service is required to undertake programmatic ESA Section 7 consultation to analyze the additive effects of the Hunting and Fishing Rule on listed species.

145.    For these reasons, Defendants are in violation of the ESA. Defendants failed to perform their nondiscretionary duty to adequately analyze—both at the programmatic and refuge-specific level—impacts to the endangered wildlife that

use the Refuge System and failed to use the best available science in their

consultations, in violation of 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.9.

146.    The Service's determination in the consultation documents that the

Hunting and Fishing Rule is not likely to adversely affect or will have no effect on

listed species is also arbitrary, capricious, an abuse of discretion, and not in

accordance with law, in violation of the APA, 5 U.S.C. § 706.

### Second Claim for Relief
### Violation of NEPA's "hard look" standard in assessing the cumulative impacts of lead

147.    Plaintiff re-alleges the allegations in all preceding paragraphs.

148.    NEPA requires federal agencies undertaking federal actions, like the

Hunting and Fishing Rule, to take a "hard look" at the cumulative impacts of such

actions—including direct, indirect, and cumulative impacts. This includes

"incremental impact[s]," like the addition of lead, "when added to other past,

present, and reasonably foreseeable future actions."

149.    The Service did not adequately consider in its environmental

assessments or CIR the past use of lead on the refuges. Specifically, the agency did

not consider how lead accumulates on the refuges from past use, and how the

newly authorized lead use in the Hunting and Fishing Rule, when combined with

past use, adds "incremental impacts."

150.    Moreover, the Service did not consider the "foreseeable future actions." Given that the agency has expanded use of lead for hunting and sport fishing opportunities in the past several administrations, it is foreseeable that this pattern will continue in the future.

151.    The Service did not consider use of lead on and off the refuges and the cumulative effects of such lead exposure on migratory waterbirds, like whooping cranes, or endangered scavengers with large territories, like jaguars.

152.    The Service did not consider that whooping cranes are susceptible to ingesting lead through their feeding and behavioral patterns and that even small amounts of ingested lead cause impairment or death. The agency did not consider the effects that spent lead and fragmented bullets have on whooping cranes.

153.    The Service did not consider that endangered scavenging wildlife, like ocelots, jaguars, jaguarundi, or the Audubon's crested caracara, could be exposed to lead when scavenging on carcasses containing lead shot or lead fragments.

154.    The Service failed to take the requisite hard look at the direct, indirect, and cumulative impacts of lead in the CIRs or environmental assessments for refuges affected by the Hunting and Fishing Rule, including the ones named in this Complaint.

155.    The Service's failure to take a hard look, as required by NEPA, is also arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA, 5 U.S.C. § 706.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Declare that Defendants have violated and are violating Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, 50 C.F.R. Part 402, by failing to adequately complete the consultations necessary to ensure that the Hunting and Fishing Rule is not likely to jeopardize the continued existence of the endangered and threatened species identified herein or adversely modify their critical habitat;

B. Declare that the Service has violated and is violating NEPA, 42 U.S.C. §§ 4321 et seq., and the implementing CEQ regulations, 40 C.F.R. §§ 1500.1 et seq., by failing to take a hard look at the indirect, direct and cumulative effects of the Hunting and Fishing Rule's expansion of lead use;

C. Order the Service to complete—on a programmatic and refuge-specific basis—adequate consultations pursuant to Section 7(a)(2) of the ESA on the effects to the endangered and threatened species identified herein in an expeditious fashion;

D. Order the Service to complete the required NEPA analysis in an expeditious fashion;

E. Vacate the Hunting and Fishing Rule or enjoin its expansion of hunting and use of lead ammunition and tackle until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

F. Award Plaintiff's its reasonable fees, costs, and expenses associated with this litigation under 28 U.S.C. § 2412; and

G. Grant Plaintiff such additional and further relief as the Court may deem just and appropriate.

Respectfully submitted and dated this 29th day of November, 2021.

*/s/ Camila Cossío* *
Camila Cossío
Center for Biological Diversity
P.O. Box 11375
Portland, OR 97211
Phone: 971-717-6727
ccossio@biologicaldiversity.org

*/s/ Collette Adkins* *
Collette L. Adkins
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN 55014-0595
Phone: (651) 955-3821
cadkins@biologicaldiversity.org

*/s/ Kristine M. Akland*_____
Kristine M. Akland
Center for Biological Diversity
P.O. Box 7274
Missoula, MT 59807
Phone: (406) 544-9863
kakland@biologicaldiversity.org

*Seeking Pro Hac Vice Admission

*Attorneys for Plaintiffs*